RAYMOND S. PETERSEN *et al.*, Plaintiffs-Appellees, *v.* HUBSCHMAN CONSTRUCTION CO., INC., *et al.*, Defendants-Appellants.

Second District   No. 76-163

Opinion filed October 12, 1977.

Collins, Stepanich & Collins, of Waukegan, and Berstein & Waller, of Chicago, for appellants.

Rawles, Katz, DeSanto & Goshgarian, Ltd., of Waukegan (Stephen H. Katz, of counsel), for appellees.

Mr. PRESIDING JUSTICE RECHENMACHER delivered the opinion of the court:

The Petersens entered into a contract with Hubschman Construction Co., Inc. (hereafter "Hubschman"), for the construction and purchase of a

new home. The contract also provided that the Petersens were to receive a credit (on the contract price of $71,400) for plumbing and other work which was to be done by Mr. Petersen, who was a heating and plumbing contractor. After the home was nearly complete, a dispute arose concerning certain aspects of the construction which the Petersens contended were unfinished or unsatisfactory, and the Petersens refused to close the transaction unless a $1,000 escrow account was established with funds "held back" from the balance due Hubschman at closing. Hubschman refused to close on this basis and, after giving the Petersens notice, informed them that their earnest money and interest under the contract were forfeited. Mr. Petersen responded by filing a mechanic's lien, and later, the Petersens filed suit, individually and on behalf of Mr. Petersen's business, to recover their earnest money of $10,500 and the value of labor and materials provided to the subject property by Mr. Petersen. Hubschman counterclaimed, seeking damages for the wrongful filing of the mechanic's lien by Mr. Petersen. After a bench trial, the court found for the Petersens on both their complaint and the counterclaim, and entered a judgment in their favor for $19,668.58. Hubschman appeals from the entry of that judgment.

The parties entered into the contract on April 4, 1972. It provided that $500 was to be paid upon execution, with another $28,000 payment on May 8, 1972. The latter payment was never made by the Petersens, nor demanded by Hubschman, and counsel for Hubschman has conceded that any default in the failure to make this payment has been waived. The contract provided that Hubschman was to have four months to complete the construction. However, due to marital difficulties, Mr. Petersen phoned a representative of Hubschman and requested that they "hold off" on construction of the home. Hubschman agreed to do so. In early September of 1972, Mr. Petersen indicated to Hubschman that his marital difficulties were resolved and requested that construction be resumed; he also paid Hubschman $10,000 toward the purchase price. Hubschman accepted the money and resumed construction. Throughout the construction period, Mr. Petersen worked upon the property, installing the plumbing and other items.

In November and December of 1972, as the home was nearing completion, Mr. Petersen had a number of conversations with Dick Bruneman, a representative of Hubschman, concerning incomplete or unsatisfactory aspects of the construction. Mr. Petersen complained that the drywall was defective, since seams had pulled loose and nails were "popping" throughout much of the house. He pointed out that the house was built over a spring and that water flowed continuously into the basement. Mr. Bruneman responded that this was a "normal thing in that area." Mr. Petersen stated that the basement floor was not pitched toward

the floor drain and would not drain properly, but Mr. Bruneman responded that "it's too late to do anything about it." Mr. Petersen also complained that a bay window, the siding, and the front door had been improperly installed. Mr. Petersen and Bruneman discussed the fact that the grading had not been completed, and agreed that it would not be possible for Hubschman to finish it until the following spring.

Hubschman recalled the drywall contractor, Mr. James Miller. At trial, Miller testified that he repaired "nail pops" and other drywall problems throughout the house, explaining that "[w]herever Mr. Petersen wanted it fixed, I fixed". Hubschman also sent one of its foremen, Roger Garrity, to the house. Among other instructions, Garrity was told to "try to make the siding look decent." At trial, he testified that the siding and bay window had not been properly installed. He said that he repaired the bay window "as much as you can. When something isn't done in the first place, isn't done right, you can't do anything about water and things." Similarly, he indicated that they repaired the siding to "the best we could without taking off the siding," and that, in his view, the siding should have been redone. He said that the problem with the front door was that it was too heavy for the frame, "so all we could do with it * * * is screw the two jambs together and try to support it in some way." He testified that the front door was fixed "temporarily," "until you slammed it a few times." He remarked, in general, that there are "two ways to fix things"; "either take it all apart and do things right, or you take and try and fix what is there." He testified that he personally would not regard the result of their efforts to repair the bay window, door and siding as acceptable.

In mid-December, Mr. Petersen and Bruneman met at the house to discuss defects or uncompleted items. Mr. Petersen indicated that he would not accept the home in its current condition, but would close the transaction if $1,000 of the purchase price was put in a bank selected by Hubschman, in the name of Mr. and Mrs. Petersen and Hubschman Construction, as an escrow to assure the proper completion of unfinished work on the home. Bruneman replied that "we don't do that kind of business." Mr. Petersen then indicated that he would "get back to" Bruneman. Hubschman mailed the Petersens a letter, dated December 21, 1972, pursuant to the default provisions of the contract, giving the Petersens 10 days' notice of Hubschman's intent to terminate the contract and forfeit all payments made by the Petersens, unless the full balance due under the contract was paid within that time.

On December 29, 1972, the Petersens, their attorney, Mr. Malkin, attorney Bernstein, representing Hubschman, and Bruneman, had a meeting at the house in an attempt to resolve the parties' differences. They went over various items which Mr. Petersen contended were incomplete or defective. According to Mr. Petersen's testimony he refused to accept

the siding; Bruneman responded that "something could be done with it," but Mr. Petersen was unable to obtain any specific promise from Bruneman. Mr. Petersen stated that the bay window was unacceptable, and that he refused to accept the drywall work, or the front door. There was testimony that Mr. Petersen pointed out various drywall seams which showed through the paint, and nail "pops," as the parties inspected the home. Bruneman's version of the meeting was that Mr. Petersen brought up "old matters that had already been corrected." Notes taken by Mr. Malkin indicated that the Petersens offered to accept the exterior work and basement, although Malkin had no independent recollection of this. The Petersens and Bruneman both recalled that the offer to close on the basis of a $1,000 escrow was again made and rejected, although attorney Bernstein's recollection was that the escrow was never discussed. The parties parted without reaching any agreement, and shortly thereafter Hubschman informed the Petersens that their interest under the contract and earnest money were forfeited.

■■■ The trial court found that at the time Hubschman terminated the contract, "there were in existence defects in substance" in the construction of the home, including deterioration and nail "popping" in the drywall, a front door which was too large for its jamb, an improperly installed bay window, improperly installed siding, and a basement floor which was pitched in the wrong direction, and that Hubschman therefore "cannot rely on a claim of substantial performance." The evidence on certain of these points was conflicting, and, on appeal, Hubschman has argued that the trial court's findings were unsupported by the record. We have examined the record and find that the trial court's finding that there were "defects in substance" which rendered Hubschman's performance less than substantial, was not against the manifest weight of the evidence and, therefore, may not be disturbed on appeal. (*Watson Lumber Co. v. Mouser* (1975), 30 Ill. App. 3d 100, 106.) Hubschman also asserts that the trial court should have disregarded any evidence of defects in the pitch of the basement floor, or installation of the exterior siding, since the Petersens purportedly stated that they would "accept" these items. However, the only evidence of such an offer to accept these defects was in the context of the Petersens' attempt to close the transaction with the $1,000 escrow. Having rejected the escrow, it seems clear that Hubschman cannot now take sudden advantage of the balance of the Petersens' settlement offer. In sum, there was no error in the trial court's holding that, since Hubschman had not substantially performed its obligation under the contract, it had no right to demand that the Petersens perform their contractual obligation of paying the full purchase price; it follows that Hubschman had no right to forfeit the Petersens' earnest money. The governing principle in this case is thus a very simple one: "* * * a party

cannot have the benefits of a contract unless he has also performed the obligations." *Kobus v. Jefferson Ice Co.* (1971), 2 Ill. App. 3d 458, 460.

Hubschman has argued that since the home was constructed in a manner sufficient to provide shelter from the elements, and a safe place to live, Hubschman has substantially performed its contract, citing *Goggin v. Fox Valley Construction Corp.* (1977), 48 Ill. App. 3d 103, 365 N.E.2d 509. However, *Goggin* is clearly distinguishable, since it turned upon the implied warranty of habitability, and not upon the question of whether the builder had substantially performed its contract.

■■ Hubschman has also contended, in effect, that the Petersens, by demanding that $1,000 be held back from the purchase price as an escrow to insure completion of uncompleted or unsatisfactory aspects of the construction, were attempting to impose an invalid unilateral amendment to an existing bilateral contract. We observe that from the practical standpoint, arrangements for an escrow "hold back" are frequently in the best interests of both parties to a contract for the construction and sale of a new home, where a dispute has arisen regarding the quality or completion of aspects of the construction. Such arrangements tend to limit the scope and expense of the controversy between the parties, and give the parties time to resolve their dispute without resort to litigation.[1] Nonetheless, it is Hubschman's contention that since the contract contained no provision for such a "hold back," the Petersens were under a contractual duty to tender the entire contract price. The trial court's finding on the question of substantial performance, of course, is dispositive of this contention; since Hubschman had not substantially performed its obligations under the contract, it clearly had no right to demand the full purchase price from the Petersens. Further, even assuming that the defects in the construction were not of sufficient magnitude to render Hubschman's performance less than substantial, Hubschman would have no entitlement to the full contract price, for a purchaser who receives substantial performance is still entitled to a credit against the contract price as compensation for deficiencies existing in what he received, as compared to what strict performance would have given him. (*Brewer v. Custom Builders Corp.* (1976), 42 Ill. App. 3d 668, 673.) In this case, it is clear that there were defects in the construction when Hubschman informed the Petersens of its intent to declare a forfeiture. There was, therefore, a legal basis for the Petersens' refusal to make an unconditional tender of the full contract price, regardless of

---

[1] The instant case is illustrative. The "hold back" of $1,000 which the Petersens proposed, constituted approximately a mere 1.4% of the purchase price of $71,400. By contrast, Hubschman indicates that it expended $10,000 in attorney fees and other costs involved in the litigation and related matters, *even prior to trial*. The trial transcript runs to 342 pages, and to the costs of trial must be added the costs of this appeal.

whether or not the contract contained a provision for the "hold back" escrow which they proposed.

■■ The trial court made an apparently incidental finding that in June of 1973, Hubschman sold the home in question to a third party for approximately $78,000. Hubschman has attacked this finding as being without basis in the record. We hold that under the facts of this case, the trial court's finding, regarding the ultimate sale of the home in question, was not material to its decision, did not influence its decision, and that any error in such a finding was therefore harmless.

The judgment of the circuit court of Lake County is therefore affirmed.

Judgment affirmed.

BOYLE and WOODWARD, JJ., concur.